IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19–CV–300–BR

| | | |
|---|---|---|
| BRIER CREEK INTEGRATED PAIN & SPINE PLLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, et al., | ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on Brier Creek Integrated Pain & Spine PLLC's ("plaintiff") motion for temporary restraining order and preliminary injunction. (DE # 6.) The United States Department of Health and Human Services ("DHHS"); Alex M. Azar, II, in his official capacity as the Secretary of DHHS; the Centers for Medicare & Medicaid Services ("CMS"); Seema Verma, in her official capacity as the Administrator of CMS; the United States Department of the Treasury; and Steve Mnuchin, in his official capacity as the Secretary of the Treasury (collectively "Defendants"), filed a response in opposition. (DE # 9.) Thereafter, plaintiff filed a reply. (DE # 10.)

## I. BACKGROUND

This action arises over plaintiff's recoupment payments to the Federal health insurance program Medicare. Plaintiff "is a comprehensive pain management center with ten (10) locations located primarily in Eastern North Carolina." (Verified Compl., DE # 1 ¶ 10.) As a medical provider, plaintiff "is one of the largest chronic pain and opiate addiction centers in the

State of North Carolina." (Id. ¶ 11.) "[M]any of [plaintiff's] patients are Medicare beneficiaries," for which plaintiff receives Medicare reimbursements. (Id. ¶¶ 12, 14.)

As such, plaintiff is subject to post-payment audits by Medicare Zone Program Integrity Contractors ("ZPIC"). See Cumberland Cty. Hosp. Sys., Inc. v. Burwell, 816 F.3d 48, 53 (4th Cir. 2016). If a health care provider is "dissatisfied" with an audit, there is a four-step administrative appeals process. Id.

> First, the provider presents its claim to the MAC [Medicare Administrative Contractor] for a "redetermination." Id. (citing 42 U.S.C. § 1395ff(a)(3)(A), (a)(3)(C)(ii) ). If the MAC denies the "redetermination," the provider can seek "reconsideration" by a Qualified Independent Contractor ("QIC"). 42 U.S.C. § 1395ff(c). Both of these review processes are overseen by CMS. Burwell, 812 F.3d at 185. "If the provider remains unsatisfied, and if its claim exceeds $150, it may continue to the third stage: de novo review by an administrative law judge ["ALJ"], including a hearing." Id. (citations omitted). "This stage of the process is overseen by the Office of Medicare Hearings and Appeals ["OMHA"], which houses ALJs and their support staff, and which is funded by a separate appropriation." Id. at 185–86 (citations omitted). The final administrative appeal stage involves de novo review by the Medicare Appeals Council, which is a division of the Departmental Appeals Board ("DAB"). Id. at 186. "Although the DAB has authority to hold a hearing, it does so only if there is an extraordinary question of law/policy/fact." Id. (quotation omitted). Only after a party exhausts these administrative appeals may it seek judicial review in federal court.
>
> In order to streamline the appeals process, there are statutory time frames for each step of the process. Redetermination by the MACs shall be conducted within sixty days. 42 U.S.C. § 1395ff(a)(3)(C)(ii). QICs shall conduct and decide reconsiderations within sixty days. Id. § 1395ff(c)(3)(C)(i). ALJs "shall conduct and conclude a hearing . . . and render a decision within ninety days," though the appealing provider may waive this deadline. Id. § 1395ff(d)(1)(A), (B). Finally, the DAB must make a decision or remand the case to the ALJ for reconsideration within ninety days. Id. § 1395ff(d)(2)(A). If these time periods are complied with, appeals will proceed through the administrative process within approximately a year. The statutory scheme does, however, prescribe consequences for failure to meet several of the deadlines. "In a process commonly referred to as escalation, a provider that has been waiting for longer than the statutory time limit may advance its appeal to the next stage." Burwell, 812 F.3d at 186 (internal quotation marks omitted).

Accident, Injury & Rehab., PC v. Azar, No. 4:18–CV–02173–DCC, 2018 WL 4625791, at *2 (D.S.C. Sept. 27, 2018). Medicare's statutes also provide for the government's power to recoup a health care provider's overpayment, see 42 U.S.C. § 1395gg, providing that such recoupment will not begin until the third stage of administrative appellate review, see 42 U.S.C. § 1395ddd(f)(2).

In May 2013, plaintiff was subject to its first post-payment audit by the ZPIC AdvanceMed. (Verified Compl., DE # 1 ¶¶ 16–19; Resp. Opp'n, DE # 9, at 8.) As a result, AdvanceMed initially concluded that plaintiff received an overpayment of $11,339,726,10 and informed plaintiff that its Medicare payments were being suspended. (Verified Compl., DE # 1 ¶¶ 20, 21.) Plaintiff submitted a rebuttal statement challenging the overpayment, to which AdvanceMed notified plaintiff the overpayment, and suspension of Medicare payments, would stay in place. (Id. ¶ 21.) Continuing with its audit, AdvanceMed requested more medical records from plaintiff and determined a second overpayment of $294,020.07. (Id. ¶¶ 23, 24.) As such, plaintiff's Medicare overpayments totaled $11,645,201.49. (Id. ¶ 25.) AdvanceMed sent five letters to plaintiff seeking repayment. (Id. ¶ 26.) Plaintiff responded to each of AdvanceMed's letters and sought a redetermination. (Id.)

As a result, three Redetermination Decisions were issued by the MAC Palmetto GBA, LLC ("Palmetto"). (Id. ¶ 27.) The first, dated 26 February 2016, was "Partially Favorable," concluding "that an overpayment was made in the amount of $11,131,477.64." (Id. ¶ 28.) The second, dated 7 March 2016, was "Unfavorable, but nevertheless purported to reduce the alleged overpayment determination from $11,455.12 to $11,264.98." (Id. ¶ 29.) The third, dated 15 March 2016, was "Unfavorable and affirmed an overpayment determination of $294,020.27." (Id. ¶ 30.) Plaintiff appealed all three Redetermination Decisions.

In response to plaintiff's appeal, the QIC C2C Solutions, Inc., ("C2C") issued three "Unfavorable" Reconsideration Decisions, two dated 14 July 2016 and one 15 July 2016. (Id. ¶ 32.) In response, plaintiff sent three requests, one for each Reconsideration Decision, for a hearing before an ALJ. (Id. ¶ 34.) OMHA acknowledged receipt of these requests on 12 September 2016. (Id. ¶ 35.) However, no hearing date has been set due to the high volume of ALJ hearing requests. (Id. ¶ 36; Resp. Opp'n, DE # 9, at 9.) While review is pending, the overpayment amount associated with all three Reconsideration Decisions has been paid, or "recouped." (Verified Compl., DE # 1 ¶ 37.)

Additionally, in November 2015, AdvanceMed conduced another post-payment audit, determining that plaintiff had received another overpayment of $7,751,564.28. (Id. ¶ 40.) Plaintiff followed the same appeals process, first sending a rebuttal statement to AdvanceMed, (id. ¶ 41), then a Redetermination Request to Palmetto, (id. ¶ 43), followed by a Reconsideration Request to C2C, (id. ¶ 45). C2C returned a "Partially Favorable" Reconsideration Decision on 5 June 2017, and on 7 June 2017, Palmetto informed plaintiff of its reduced overpayment of $5,796,266.21. (Id. ¶ 47.) Plaintiff appealed the Reconsideration Decision, of which OMHA acknowledged receipt on 1 August 2017. (Id. ¶¶ 48, 49.) A hearing before the ALJ has not yet been set. (Resp. Opp'n, DE # 9, at 9.) Approximately $3,828,788.61 of the overpayment has been recouped as of May 2019. (Verified Compl., DE # 1 ¶ 51.)

In 2018, plaintiff's revenues dropped from $14,754,490.21 to $7,809,734.39. (Id. ¶ 57.) Prior to 2014, approximately 48.5% of plaintiff's revenue came from Medicare reimbursements, but in 2018, this reduced to 29%. (Id. ¶ 58.) From 2014 to 19 July 2019, plaintiff reduced its staff from 92 employees to 51 employees. (Id. ¶ 59.) In addition, "payroll expenses for wages decrease[d] from $6,007,185.41 in 2014 to $3,685,006.01 in 2018[,]" (id.), and a staff physician

4

agreed to a temporary $175,000 salary reduction, (id. ¶ 60). Further, "Dr. [Robert Dale] Wadley [("Wadley")] and his wife personally advanced another $85,753.37 to [plaintiff] in order to keep it afloat[.]" (Id. ¶ 62.)

Plaintiff filed this action for denial of procedural due process, and for relief under the *Ultra Vires* Act and the Administrative Procedures Act. (Id. at 12–14.) As a remedy, plaintiff requests a temporary restraining order ("TRO") and injunction, a security waiver, and a judgment in its favor. (Id. at 16.)

Plaintiff now contends that with its Medicare recoupment payments it "will be unable to keep its door open and will have to file bankruptcy." (Id. ¶ 64.) As such, plaintiff requests temporary and preliminary "relief from the recoupment procedures and payments" while it waits for an ALJ hearing, (id. ¶ 71), under a theory of denial of procedural due process, (Mem. Supp. Prelim. Inj. & TRO, DE # 7, at 11). The parties dispute both the subject matter jurisdiction of this court to rule on plaintiff's motion and the merits of the motion.

## II. DISCUSSION

### A. Subject Matter Jurisdiction

Plaintiff contends this court has jurisdiction pursuant to the "collateral-claim exception" to 42 U.S.C. § 405(g). (Id. at 11.) Defendants contend that jurisdiction over Medicare matters is very limited and that even if the court can consider plaintiff's collateral claim, plaintiff cannot show that it has a substantial likelihood to prevail on that claim. (Resp. Opp'n, DE # 9, at 10, 12.)

> Under 42 U.S.C. § 405(g) and (h), federal courts are vested with jurisdiction over only a 'final decision' of HHS when dealing with claims 'arising under' the Medicaid Act. Ordinarily, this means that a provider may come to district court only after either (1) satisfying all four stages of administrative appeal, i.e., after the Council has rendered a decision, or (2) after the provider has escalated the claim to

agreed to a temporary $175,000 salary reduction, (id. ¶ 60). Further, "Dr. [Robert Dale] Wadley [("Wadley")] and his wife personally advanced another $85,753.37 to [plaintiff] in order to keep it afloat[.]" (Id. ¶ 62.)

Plaintiff filed this action for denial of procedural due process, and for relief under the *Ultra Vires* Act and the Administrative Procedures Act. (Id. at 12–14.) As a remedy, plaintiff requests a temporary restraining order ("TRO") and injunction, a security waiver, and a judgment in its favor. (Id. at 16.)

Plaintiff now contends that with its Medicare recoupment payments it "will be unable to keep its door open and will have to file bankruptcy." (Id. ¶ 64.) As such, plaintiff requests temporary and preliminary "relief from the recoupment procedures and payments" while it waits for an ALJ hearing, (id. ¶ 71), under a theory of denial of procedural due process, (Mem. Supp. Prelim. Inj. & TRO, DE # 7, at 11). The parties dispute both the subject matter jurisdiction of this court to rule on plaintiff's motion and the merits of the motion.

## II. DISCUSSION

**A. Subject Matter Jurisdiction**

Plaintiff contends this court has jurisdiction pursuant to the "collateral-claim exception" to 42 U.S.C. § 405(g). (Id. at 11.) Defendants contend that jurisdiction over Medicare matters is very limited and that even if the court can consider plaintiff's collateral claim, plaintiff cannot show that it has a substantial likelihood to prevail on that claim. (Resp. Opp'n, DE # 9, at 10, 12.)

> Under 42 U.S.C. § 405(g) and (h), federal courts are vested with jurisdiction over only a 'final decision' of HHS when dealing with claims 'arising under' the Medicaid Act. Ordinarily, this means that a provider may come to district court only after either (1) satisfying all four stages of administrative appeal, i.e., after the Council has rendered a decision, or (2) after the provider has escalated the claim to

>the Council and the Council acts or fails to act within 180 days. Id. §§ 405(g), (h); 42 C.F.R. § 405.1132.

Family Rehab., Inc. v. Azar, 886 F.3d 496, 500–01 (5th Cir. 2018). However, there are exceptions to this jurisdictional bar. One such exception is for "collateral-claims." See Mathews v. Eldridge, 424 U.S. 319, 331 (1976). Under this exception, a federal court has jurisdiction over claims that are: (1) entirely collateral to all underlying substantives issues; (2) and colorable so that erroneous deprivation prior to exhaustion of any underlying issues would harm the claimant in a way that it could not be compensated through retroactive payment. See id; accord Heckler v. Ringer, 466 U.S. 602, 614 (1984); Varandani v. Bowen, 824 F.2d 307, 310 (4th Cir. 1987); Ram v. Heckler, 792 F.2d 444, 446 (4th Cir. 1986); Accident, Injury & Rehab., 2018 WL 4625791, at *5; Robie v. Price, No. 2:17–CV–03089, 2017 WL 3188572, at *4 (S.D.W. Va. July 26, 2017); Ross v. Colvin, No. CIV. DKC 14–2967, 2015 WL 4622393, at *6 (D. Md. July 29, 2015), aff'd, 633 F. App'x 188 (4th Cir. 2016); Native Angels Home Health, Inc. v. Burwell, No. 5:15–CV–234–FL, 2015 WL 3657417, at *2 (E.D.N.C. June 12, 2015).

### 1. Collateral Claim

A claim is collateral when a final decision on the underlying issue would not answer the constitutional challenge brought by the collateral claim. See Ram, 792 F.2d at 446. Failure to receive procedural due process can be collateral. Mathews, 424 U.S. at 331–32; Family Rehab., 886 F.3d at 503; Ram, 792 F.2d at 446.

In this action, plaintiff brings a due process claim against the government based on the ongoing recoupment payments while it waits for an ALJ appeal. Whether the denial of this process, ongoing recoupment payments during prolonged delay for an ALJ hearing, violates the Constitution is independent of the merits of the underlying administrative appeal, plaintiff's challenge to the amount of its Medicare overpayments. See Accident, Injury & Rehab., 2018

6

WL 4625791, at *5 ("Plaintiff's claims in this matter are entirely collateral to the issues of whether it will ultimately succeed on its administrative appeals[.]"). As such, plaintiff's claim is collateral.

### 2. Colorable Claim

"A claim is colorable if it is arguable and nonfrivolous, whether or not it would succeed on the merits." Moon v. BWX Techs., Inc., 498 F. App'x 268, 274 (4th Cir. 2012) (internal citation and quotation marks omitted). See also Richardson v. United States, 468 U.S. 317, 326 n.12 (1984) ("A colorable claim, of course, presupposes that there is some possible validity to a claim."); Panaras v. Liquid Carbonic Indus. Corp., 74 F.3d 786, 790 (7th Cir. 1996) ("The requirement of a colorable claim is not a stringent one.").

Defendants contend that even if the court finds plaintiff's due process claim to be collateral, plaintiff has no substantial likelihood of prevailing on that claim. However, plaintiff only must show that its due process claim is colorable, not that it is substantially likely to prevail upon its claim to establish jurisdiction.

Here, plaintiff contends that it has waited almost three years for an ALJ hearing and that due to the ongoing recoupment during this period, revenue dropped, pay cuts and staff downsizing occurred, the business is only afloat as a result of a personal advance from a practice doctor, and the ongoing recoupment has subject it to bankruptcy and closing its doors. (See Verified Compl., DE # 1 ¶¶ 59–64.) As such, the claim is arguable and nonfrivolous. See Accident, Injury & Rehab., 2018 WL 4625791, at *5 (finding plaintiff "raised a colorable claim that erroneous deprivation, by way of recoupment, prior to exhaustion of administrative remedies would harm it in a way that could not be compensated[]"). Accordingly, the court has subject matter jurisdiction pursuant to the collateral-claim exception of 42 U.S.C. § 405(g).

7

**B.    Temporary Restraining Order**

"Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. Pro. 65(d)(1).  TROs are limited to fourteen days.  See Fed. R. Civ. Pro. 65(b)(2). "The standard for granting either a TRO or a preliminary injunction is the same." Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States, 354 F. Supp. 3d 690, 693 (E.D. Va. 2018) (citing Sarsour v. Trump, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017)); see also Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 345 (4th Cir. 2009) ("Because a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by "a clear showing" that, among other things, it is likely to succeed on the merits at trial.").  As such, the party seeking the temporary restraining order must make a clear showing that:

> (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest.

League of Women Voters of N. Carolina v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)); accord Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

**1.    Likelihood of Success**

First, the court must determine whether plaintiff is likely to succeed on its procedural due process claim.  "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews, 424 U.S. at 332. "[W]e pose two

8

questions when reviewing a claimed procedural due process violation: '[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" United States v. Al-Hamdi, 356 F.3d 564, 574 (4th Cir. 2004) (internal citation omitted).

Property interests "take many forms." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 576 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Id. at 577. Health care providers have a "property interest in [] ongoing Medicare payments for services rendered to patients." See Accident, Injury & Rehab., 2018 WL 4625791, at *7.

Additionally, there are three factors which bear upon the constitutional adequacy of the procedures:

> [1] private interest that will be affected by the official action; [] [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [] [3] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335.

### i. Private Interest

Defendants contend that the "authorities are consistent in characterizing the private interest of a health care business that chooses to pursue Medicare revenues as a relatively limited one, for the purposes of Constitutional inquiry." (Resp. Opp'n, DE # 9, at 16 (citing Native Angels Home Health, Inc. v. Burwell, 123 F. Supp. 3d 775, 777–78 (E.D.N.C. 2015) (defining a difference between Medicare providers and Medicare recipients, provider's interest stake is not

substantial)).) Plaintiff acknowledges that there is a difference in an individual's right to receive a government benefit and a business's interest to receive government payment (Mem. Supp. Prelim. Inj. & TRO, DE # 7 at 14 (citing Schweiker v. McClure, 456 U.S. 188, 198 (1982))), but contends that there is also a difference in a health care business's interest for services rendered as opposed to continued participation in a government program, (id.).

The court agrees with plaintiff that there is a distinction to be made for a business's interest in an ongoing Medicare recoupment because it relates to past services. Plaintiff has a significant property interest in payments for the medical services it has already provided to its patients. See Accident, Injury & Rehab., 2018 WL 4625791, at *7.

### ii. Erroneous Deprivation

Defendants contend plaintiff will not suffer from erroneous deprivation because the Medicare appeals process provides ample process in its four-step appeals system and that plaintiff, currently at the third round of review, can speed up that process by escalating its appeal to the next, and final, level. (Resp. Opp'n, DE # 9, at 17–19.) Plaintiff contends that "escalation is not constitutionally adequate because the Council is not required to conduct additional proceedings, including a hearing with direct and cross examination." (Mem. Supp. Prelim. Inj. & TRO, DE # 7, at 15.) Plaintiff contends "its interest in live hearing and the examination of witnesses is particularly strong given [plaintiff's] basis for challenging the underlying Defendants' overpayment calculations, including Defendants' statistical sampling and methodologies." (Id. at 17.)

Defendants' argument rests on the Fourth Circuit's opinion in Cumberland County, 816 F.3d 48, 55–56 (4th Cir. 2016). In Cumberland County, the Fourth Circuit affirmed this court's decision to dismiss a health care system's claim for the issuance of a writ of mandamus on the

10

basis that the health care system had a "clear and indisputable right to an ALJ hearing within a 90-day time frame[.]" 816 F.3d at 51. The Fourth Circuit recognized that "within th[e] [Medicare] administrative process, a healthcare provider can bypass administrative reviews if such reviews are delayed, 'escalating' for review by a United States district court within a relatively expeditious time." Id. at 50. However, that reasoning is readily distinguishable from the case at hand because of the constitutional nature of plaintiff's claim and the remedy sought. As the District of South Carolina explained when presented with the same due process claim in the same procedural posture,

> Based on Cumberland County, the Court is unquestionably prohibited from ordering Defendants to provide Plaintiff with an ALJ hearing. But Cumberland County's . . . dicta on due process concerns did not involve a challenge to ongoing recoupment during the pendency of a provider's wait for an ALJ hearing . . . . Because Cumberland County was decided in a different procedural posture than the case at bar and did not involve a procedural due process claim where there was ongoing recoupment, the Court finds Cumberland County is not controlling . . . . Cross examination at a de novo hearing before an independent arbiter may very well be the only means to obtain the evidence needed to vindicate Plaintiff's property interest, and the only opportunity for this cross examination is at the ALJ hearing.

2018 WL 4625791, at *6–7.

Similarly, here, plaintiff seeks to challenge defendants' statistical analysis by cross-examining defendants' analyst before the ALJ, (see Verified Compl. Ex. 16, DE # 1-16, at 5, 9 (challenging the statistically valid random sample methodology)), as opposed to seeking repayment of the funds it has paid through recoupment, cf. AvuTox, LLC v. Burwell, No. 5:15–CV–634–FL, 2017 WL 767449, at *5 (E.D.N.C. Jan. 24, 2017), or the ordering of an ALJ hearing, cf. Cumberland County, 816 F.3d at 55–56. As there is no reasonable probability plaintiff will be able to obtain a hearing at the next step in the Medicare appeals process, and plaintiff's success rests on its ability to challenge defendants' statistical analysis through cross-

11

examination—which was not previously available and is only available at the ALJ hearing, see Accident, Injury & Rehab., 2018 WL 4625791, at *7—the court finds substantial risk of erroneous deprivation of plaintiff's property interest absent its ability to build a record at the ALJ hearing stage.

### iii. Government Interest

Defendants contend "[t]he Government's interest in commencing the recoupment of overpayments expeditiously [] is a key element of the payment system to which Plaintiff subscribed itself when it chose to pursue Medicare revenues." (Resp. Opp'n, DE # 9, at 22.) Because Medicare is an "enormous benefits program" that "need[s] to conserve scarce public resources," its ability to "recover[] expeditiously the Medicare funds that have been determined to have been paid out improperly, is critical to the program's continued ability to provide for the needs of its elderly and disabled beneficiaries." (Id. at 21–22.)

While defendants have an interest in the expeditious recoupment of those payments to support the Medicare payment system as a whole, such quickness in receiving recoupment, must, at some point, yield to the slowness of due process owed. Further, defendants are not burdened by plaintiff's request for injunctive relief because plaintiff does not seek to add or substitute any procedural requirements. Rather, plaintiff seeks to stay recoupment payments while the existing procedural requirements run on the ground that defendants' recoupment has outpaced the plaintiff's existing due process requirements. No additional fiscal and administrative burdens would be added to the government's interest because plaintiff waits for an ALJ hearing regardless of this lawsuit. Rather, it is only the recoupment of payments while plaintiff's wait for a hearing that would cease. Weighing all these factors bearing on the adequacy of the

procedures provided, the court concludes plaintiff has made a clear showing of likelihood of success on the merits of its due process claim.

### 2. Irreparable harm

Plaintiff verifies that as a result of the Medicare recoupments to date it has suffered adverse consequences: its revenue dropped (Verified Compl., DE # 1 ¶ 57); staff have been fired (id. ¶ 59); salaries for remaining staff have been reduced (id. ¶ 60); the business has only remained "afloat" because of personal advances given by one of plaintiff's physicians, Dr. Wadley (id. ¶ 62); and plaintiff will have to file for bankruptcy absent relief and close, (id. ¶ 64). In response, defendants contend that "as a general matter, monetary loss, such as loss of income, does not constitute irreparable harm." (Resp. Opp'n, DE # 9, at 23–24 (citing Sampson v. Murray, 415 U.S. 61, 63, 89, 90 (1974)).) Defendants contend this theory applies to recoupments under Medicare and provides case examples of courts that "have rejected various allegations about the effects of the Medicare program's recovery of overpaid amounts." (Id. at 24.)

Plaintiff's threat of bankruptcy establishes a substantial threat of immediate and irreparable harm for which no adequate remedy at law exists. See Accident, Injury & Rehab., 2018 WL 4625791, at *9 (finding plaintiff's threat of bankruptcy and severe financial damage in this case meets the requirements of establishing a substantial threat of immediate and irreparable harm); cf. Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp., 17 F.3d 691, 694 (4th Cir. 1994) (finding that courts generally find money damages insufficient to establish irreparable harm because "[m]onetary relief typically may be granted as easily at judgment as at a preliminary injunction hearing").

13

None of defendants' cited cases persuade the court to find otherwise. Unlike the plaintiff in Great Rivers Home Care, Inc. v. Thompson, 170 F. Supp. 2d 900, 905 (E.D. Mo. 2001), who failed in its attempt to exhaust its administrative remedies, plaintiff here has been thwarted from exhausting its administrative remedies. Further, unlike the plaintiff in Lynncore Medgroup, Inc. v. Sebelius, No. 4:11–CV–195, 2011 WL 6116536, at *6 (E.D. Tex. Nov. 10, 2011), whose claim was dismissed for lack of subject matter jurisdiction in part because of the known risk to health care providers in the Medicare program, plaintiff in this case does not dispute the risk of depending on Medicare payments for revenue, but that it is forcing bankruptcy as a result of a denial of due process. Lastly, while the court in Reliable Home Health Care, Inc. v. Thompson, No. CIV.A. 01–2343, 2002 WL 22025, at *5 (E.D. La. Jan. 4, 2002), found that "economic harm alone is insufficient to constitute irreparable harm [and] [t]here is no evidence that [plaintiff's] []patients will be deprived of necessary services if [plaintiff] is forced out of business," here, plaintiff contends in its verified complaint that it serves "roughly 7000 patients [who] would have difficulty being absorbed by other providers [if forced to close], especially in the more rural locations [in] which [plaintiff] provides service," (Verified Compl., DE # 1 ¶ 82).

### 3. Balance of Equities

Plaintiff contends that absent relief, it "will shut down, employees will lose their employment, and patients will lose their healthcare provider if the temporary restraining order is not granted." (Mem. Supp. Prelim. Inj. & TRO, DE # 7 at 21; see also Verified Compl., DE # ¶ 64.) In response, defendants contend that "the government's interest in conserving scarce [Medicare] resources . . . is much stronger than the financial interest of a corporation or other private entity." (Resp. Opp'n, DE # 9, at 25 (citing Northwest Healthcare, L.P. v. Sullivan, 793 F. Supp. 724, 727–28 (W.D. Tex. 1992) (citations omitted)).) Defendants also contend that there

needs to be fairness to all businesses who participate in Medicare, therefore, plaintiff cannot be singled out as the only entity not subject to recoupment while waiting for an ALJ hearing. (Id. at 25–26.)

Plaintiff's demonstrated harm, threat of insolvency, substantially outweighs the harm defendants may suffer by delaying the collection of plaintiff's Medicare recoupments until plaintiff's ALJ hearing. Defendants' contention that the government's interest outweighs that of a corporation's financial interest, as in Northwest Healthcare, does not apply to these facts because this case does not involve just the "'death' of a corporation" but a claim that employees and patients may be deprived of a living and healthcare as a result of the corporation's insolvency. 793 F. Supp. at 727–28.

### 4. Public Interest

Defendants contend that "[t]he public interest lies in the effective administration of the Medicare Program nationwide." (Resp. Opp'n, DE # 9, at 26 (citing Group Health, Inc. v. Schweiker, 549 F. Supp. 135, 145 (S.D. Fla. 1982)).) Further, defendants argue there are "no shortage of sources of pain management care available to the public[,]" and provides a print-out list of other pain management providers in the Raleigh, North Carolina area. (Id. at 27.) Plaintiff contends its "patients will be adversely affected if [plaintiff] closes its doors . . . [as it] provides medical services in some of the most economically depressed counties in the state." (Mem. Supp. Prelim. Inj. & TRO, DE # 7, at 22.)

"[Plaintiff] is one of the largest chronic pain and opiate addiction centers in the State of North Carolina." (Verified Compl., DE # 1 ¶ 11.) It has ten offices in the regional Eastern North Carolina area. (Id. ¶ 12.) It serves "roughly 7000 patients [who] would have difficulty being absorbed by other providers [if it is forced to close], especially in the more rural locations [in]

which [plaintiff] provides service." (Id. ¶ 82.) As such, "the local opiate crisis would worsen." (Id.) While defendants name some alternative pain management providers in the Raleigh, North Carolina area (see DE # 9-3), they do not offer any alternatives for patients in plaintiff's practice in the Eastern North Carolina region as a whole, which includes various remote areas. Further, the closing of plaintiff's practice, in Raleigh and Eastern North Carolina as a whole, given the size of plaintiff's practice, would greatly impact the public's available medical services. See Accident, Injury & Rehab., 2018 WL 4625791, at *9 ("There is no question that the public at large—particularly the vulnerable Medicare population—will be better served by more, rather than less, access to healthcare."). Plaintiff also provides a particularly relevant and important medical service in the nationwide opioid epidemic. See United States v. Walker, No. 2:17–CR–00010, 2017 WL 2766452, at *5 (S.D.W. Va. June 26, 2017) ("The heroin and opioid epidemic is one of the great public health problems of our time.").

Based on the foregoing, plaintiff has made a clear showing that it is likely to succeed on the merits, it will likely suffer irreparable harm in the form of bankruptcy absent an injunction, the balance of hardships weighs in its favor, and that a temporary restraining order is in the public interest. Plaintiff's motion for a temporary restraining order will be granted.

**5.     Bond Requirement**

Plaintiff requests the court waive Federal Rule of Civil Procedure 65(c)'s bond requirement. (See Mem. Supp. Prelim. Inj. & TRO, DE # 7, at 22 (citing Pashby v. Delia, 709 F.3d 307, 332 (4th Cir. 2013); Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999)).) Plaintiff contends "Defendants will suffer no damages from the injunction sought by [plaintiff]. Whatever legitimate rights to recoupment Defendants may have will be adjudicated by an ALJ, and Defendants may resume recoupment if they prevail." (Id.)

16

Defendants did not respond to plaintiff's request for this court to set a bond amount or waive the requirement.

Under Rule 65(c),

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c). However, as noted in Accident, Injury & Rehab., 2018 WL 4625791, at *10, the court retains discretion to set the bond amount or waive the requirement. There, in ruling on the same bond requirement at issue here, the court found those defendants would not suffer meaningful harm as the relevant recoupment agency could continue to recoup payments against plaintiff after the ALJ hearing took place. Id. As such, the court waives the bond requirement.

### III. CONCLUSION

For the aforementioned reasons, the court GRANTS plaintiff's motion for a temporary restraining order and RESERVES ruling on plaintiff's motion for a preliminary injunction. (DE # 6.) The temporary restraining order expires at 5:00 pm on Thursday, 19 September 2019. Further, the court DIRECTS the clerk to set a hearing on plaintiff's motion for a preliminary injunction on Thursday, 19 September 2019.

This 5 September 2019.

_____
W. Earl Britt
Senior U.S. District Judge